UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-60497-BLOOM/Valle

ALEXANDR KOZYREV,

    Plaintiff,

v.

DMITRY PONOMARENKO and
FATIMA ESENOVA,

    Defendants.
_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Defendant Fatima Esenova's Motion for Attorney's Fees, ECF No. [154] ("Sanctions Motion"). Plaintiff, Alexandr Kozyrev, filed an Opposition, ECF No. [156], which Defendant, Dmitry Ponomarenko joined, *see* Opposition of Defendant Dmitry Ponomarenko, ECF No. [160]. Esenova filed a Consolidated Reply, ECF No. [174], to both Oppositions.

In connection with his Opposition, Kozyrev filed a Cross-Motion . . . For Limited Discovery Concerning Unauthorized Practiced of Law ("Discovery Motion"), ECF No. [158], and a Request . . . to Take Judicial Notice ("Judicial Notice Motion"), ECF No. [157]. Ponomarenko filed a Notice of Joinder to the Discovery Motion, ECF No. [162], and a Notice of Joinder to the Judicial Notice Motion, ECF No. [161]. Esenova filed a Response to the Discovery Motion, ECF No. [171]; to which both Kozyrev and Ponomarenko filed Replies, *see* ECF No. [176], and ECF No. [177]. Esenova also filed a Response to the Judicial Notice Motion, ECF No. [172], to which both Kozyrev and Ponomarenko filed Replies, *see* ECF No. [173] and ECF No. [175].

Finally, Esenova filed a Motion to Tax Costs ("Costs Motion"), ECF No. [153].  Kozyrev filed an Opposition ECF [155], which Ponomarenko joined, *see* Notice of Joinder ECF No. [159].  Esenova filed a Reply in the Costs Motion, *see* ECF No. [163].

The Court has carefully considered the motions, all opposing and supporting submissions, the record in this case and the applicable law, and is otherwise fully advised. For the reasons that follow, the Sanctions Motion is granted in part and denied in part, the Motion to Tax Costs is granted, the Judicial Notice Motion is granted, and the Discovery Motion is denied.

## I.    BACKGROUND

The Court assumes the reader's familiarity with the facts and legal issues underlying this case and does not repeat them in full.  Instead, the Court summarizes the procedural history of the issues that are relevant to Esenova's Sanctions Motion, as the issues underlying this motion inform the Court's decision on the Discovery Motion and Judicial Notice Motion.[1]

### A.    The Complaint and Co-Defendants' Related Marital Dispute

This case arose several months after the acrimonious divorce of Co-Defendants Ponomarenko and Esenova in May 2018.[2] On February 28, 2019, Kozyrev, a business associate of Ponomarenko's, filed a Complaint, ECF No. [1], against Ponomarenko and Esenova for breach of contract, restitution, and unjust enrichment.  Kozyrev alleged he agreed to loan $4,695,601.05 (the "Loan Amount") to Ponomarenko to invest in real estate (the "Loan Agreement"), on the condition the loans be "treated as the personal debt of Ponomarenko, backed by his spouse, Esenova, who was also to be responsible for the loan" ECF No. [1] at ¶ 7; *see also id.* at ¶ 19.  Kozyrev further alleged Co-Defendants acquired real estate in Florida, but "started to use [it] for

---

[1] The Court addresses the Costs Motion separately at the end of this Order.

[2] The Court takes judicial notice of the Broward County docket in the underlying dissolution of marriage action, Case No. FMCE-18-002681 ("Divorce Action").

personal needs only, without an intention to sell the acquired real property to repay the loans." *Id.* at ¶ 21. According to the Complaint, Kozyrev made ten separate wire transfers from his account at RosEvroBank in Moscow to Ponomarenko's account. *See id.* at ¶¶ 18–19.  Ponomarenko then "placed the funds in the custody of Esenova." *Id.* at ¶ 24. Kozyrev sought relief including the "recording of a lis pendens and/or attachment of the real estate parcels acquired in Florida with the funds loaned by Kozyrev." *Id.* at 9.

Along with his Complaint, Kozyrev submitted a translated copy of the Loan Agreement, *see* ECF No.  [1-2], executed by Kozyrev and Ponomarenko.  The Loan Agreement contains "Co-Borrowers" provision stating:

> The parties take into account that any real property acquired by a married Borrower may be considered acquired as joint marital property. Thus, in the case of the purchase of real estate or other property by the Borrower being married, his spouse is considered to be a co-borrower in accordance with this loan agreement and is equally responsible with the Borrower for this loan.
>
> For the Borrower's spouse there will be no protection against the acquisition of assets during the marriage with the Borrower.
>
> In the case of a marriage contract signed by the Borrower with his wife in Russia or in the United States, before or after signing this contract, the Parties agreed that the amount of the debt will be recovered from all property belonging to both spouses.

*Id.* at ¶ 11.  The Loan Agreement is not executed by Esenova.

The Court scheduled the case for trial starting on March 2, 2020.  *See* April 18, 2019 Order, ECF No. [17].

## B.      Disputed Ownership of Co-Defendants' House

In August 2019, Kozyrev recorded a Notice of Lis Pendens on a parcel of property located at 1270 Hatteras Ln, Hollywood, FL 33019 (the "Property"), under the caption of this lawsuit.  *See*

ECF No. [58] at 12.  The Notice, directed to Ponomarenko; Gloria Capital Miami 2016, LLC;

Aventura, LLC; "and all others whom it may concern," describes the Property and states:

> The plaintiff has instituted this action against you seeking a cancellation/rescission
> of deed, constructive trust, equitable lien/resulting trust and partition with respect
> to the property described below[.]

*Id.* at 11.

Esenova filed a Motion to Discharge [the] Lis Pendens, ECF No. [58], claiming (1) the

Property was a house belonging to her and Ponomarenko, *see id.* at ¶ 7; (2) the Property was

acquired by Ponomarenko in 2013 and fully paid for by March 25, 2014, *see id.* at ¶¶ 8–12; and

(3) Kozyrev had no equitable interest in the Property as a result of his alleged Loan Agreement

with Ponomarenko, *see id.* at ¶¶ 15–19. In support of the Motion to Discharge, Esenova submitted

a Satisfaction/Discharge of Mortgage, ECF No. [58] at 39, stating the Property's "mortgage is fully

paid, satisfied and discharged."  Esenova also claimed "[Kozyrev] and Defendant Ponomarenko

are friends and business partners" and "[t]he action before this Court is nothing less than

Ponomarenko's effort to disposes [sic] Esenova of her shares of the proceeds of the Property." *Id.*

at ¶ 20. The Court denied Esenova's Motion to Discharge because it was filed past the deadline to

file pretrial motions. *See* ECF No. [59].  Esenova moved for reconsideration, but the Court again

denied her motion, finding, based on the allegations of the Complaint, it was "far from clear that

[Esenova] [was] entitled to discharge of the lis pendens . . . ." ECF No. [63] at 3.[3]

On January 16, 2020, Kozyrev filed a Stipulated Motion . . . for Judgment by Confession

("Motion for Confession"), ECF No. [64], against Ponomarenko, stating Ponomarenko "admitted

[and] confirmed" Kozyrev loaned him $4,695,601.05, and Ponomarenko had not paid back the

same. *See id.* at 2. According to Kozyrev, in order to settle the dispute, Ponomarenko conveyed to

---

[3] On December 20, 2019 the Court permitted Esenova's counsel, Ama-Mariya Hoffenden and Martin
Wojciech Hoffenden, to withdraw from the case.  *See* ECF No. [61].

Kozyrev "any rights that he has in the real property at the address 1270 Hatteras Lane, Hollywood, FL 33019 (50% stake per title to that property), with a quitclaim deed for whatever rights he has." *Id.* Kozyrev further stated "[b]y way of reporting to the Court on the status of the ownership of the above [P]roperty, defendant **Esenova owns the other 50% interest in the title to that [P]roperty**," and as of the divorce, Ponomarenko and Esenova's "interest in said [Property] has changed to tenants in common giving each 50% interest in the [P]roperty." *Id.* (emphasis added). Finally, Kozyrev asserted Esenova was invited to "join in on the settlement on similar terms" but declined to do so. *Id.*

The same day, the Court entered a Stipulated Judgment against Dmitry Ponomarenko, ECF No. [66], dismissing the claims against Ponomarenko and allowing the case against Esenova to proceed.

### C.      Submission of the Marital Settlement Agreement and Alleged Collusion

On January 21, 2020, Esenova filed a sealed Response, ECF No. [67], to the Motion for Confession claiming the agreement between Kozyrev and Ponomarenko was in violation of a May 16, 2018 Settlement Agreement ("Martial Settlement Agreement"), *see* ECF No. [67] at 5–12, executed in connection with the Divorce Action.  The Marital Settlement Agreement, submitted along with Esenova's Response, provides that the Property, "unencumbered by a mortgage or known title" was to be sold for no less than 1,800,000.00 with the proceeds to be split between Ponomarenko and Esenova. ECF No. [67] at ¶ 10.  The Marital Settlement Agreement further provides neither Ponomarenko nor Esenova "may transfer 50% of their interest in the house without each other's consent." *Id.*

The Court entered an Order to Show Cause, ECF No. [68], directing Ponomarenko and Kozyrev to explain why the Stipulated Judgment should not be vacated in light of the Marital

Settlement Agreement.  Ponomarenko filed a Response, ECF No. [69], attaching a Quit-Claim deed dated January 12, 2020 ("2020 Quitclaim"), ECF No. [69-1], identifying Ponomarenko as Grantor and transferring the Property to Kozyrev as Grantee. The Response explains "Kozyrev . . . is presently the owner of the 50% state in the [Property]."  ECF No. [69] at 3. Ponomarkeno also stated Esenova consented to the transfer of Ponomarenko's rights in the Property to Kozyrev at a September 23, 2019 mediation. *See id.* at 4. Finally, Ponomarenko insisted he disavowed the Marital Settlement Agreement, and a state court denial of his motion to annul the Settlement Agreement was on appeal. *See id.* at 6.

For his part, Kozyrev filed a Response, ECF No. [70] also stating Esenova agreed to the transfer of Ponomarenko's 50% interest in the property to Kozyrev. *See id.* at 5.  Kozyrev submitted an additional copy of the 2020 Quitclaim, *see* ECF No. [70-2], in support of his contention.  In addition, Kozyrev insisted he was unaware of the Marital Settlement Agreement between Esenova and Ponomarenko and not bound by it. *See* ECF No. [70] 2, ¶¶ 5–6.

On review of the Marital Settlement Agreement and the parties' submissions, the Court vacated the Stipulated Judgment, stating "the [Martial Settlement Agreement] remains binding."[4] ECF No. [71] at 2.

After the Court vacated the Stipulated Judgment, Esenova moved to amend her affirmative defenses to include the argument that Ponomarenko and Kozyrev were "seemingly adverse litigants" colluding to "evade the obligations under the Marital Settlement Agreement to Esenova's detriment." ECF No. [75] at 6.  The Court denied Esenova's motion because the deadline for leave to amend had passed and Esenova had not shown "she acted with the necessary diligence to permit

---

[4] The Court noted the "two appeals with respect to Ponomarenko and Esenova's marital dissolution . . . pending before Florida's Fourth District Court of Appeal." ECF No. [71] at 2.

the assertion of the proposed affirmative defenses past the Court's deadline." ECF No. [77]; *see also* ECF No. [79] (denying motion for reconsideration).

### D.   Pre-Trial Issues

#### 1.   Discovery

During pre-trial discovery, in October 2019, Esenova requested that Kozyrev produce documentation of the alleged Loan Agreement, including (1) "[a]ll communications between Alexandr Kozyrev and Dmitry Ponomarenko regarding the contract signed on January 12, 2015," *see*, ECF No. [154] at 30–38, ¶ 1; (2) "[l]etters and faxes received by Defendant [Ponomarenko], requesting payment for the amounts alleged to be owed in the Lawsuit," *see id.* ¶ 5; (3) letters and faxes responding to Plaintiff's requests for payment, *see id.* ¶ 6; (4) "[a]ll bank statements reflecting transfers from Alexandr Kozyrev to Dmitry Ponomarenko from January 2014–present day," *see id.* ¶ 12; and (5) "[a]ll documents related to the Contract," *see id.* ¶ 8.  To each of these requests, Kozyrev responded "all responsive documents in Plaintiff's possession or under the control of Plaintiff are being produced" but "disclaim[ed]" he was "currently located in Southeast Asia for a vacation for several months, does not have immediate access to his documentation located in Moscow, Russia, but will revert to the search of the documents upon his return." *See generally* ECF No. [154] at 30–38.

Esenova also requested her Co-Defendant, Ponomarenko, produce documents including, "[a]l communications between Alexandr Kozyrev and Dmitry Ponomarenko regarding the contract signed on January 12, 2015." *See* ECF No. [154] at 40–45, ¶ 1. Like Kozyrev, Ponomarenko responded "[a]ll responsive documents that are under the control or in the possession of Defendant Ponomarenko are being produced." *Id.*

### 2.    Plaintiff's Visa

On February 7, 2020, less than one-month before the start of trial, Plaintiff filed a Motion for Leave to File and Reschedule Trial, ECF No. [80], stating he "been unable, so far to obtain an entry visa to the U.S., given the especial difficulties with a visa regime concerning Russian nationals" and had been "attempting to obtain a U.S. entry visa, unsuccessfully." *Id.* The Court denied the motion and permitted Plaintiff to appear via video conference. *See* ECF No. [84].

### E.    Trial Testimony

### 1.    Testimony Regarding Plaintiff's Visa Application

Trial began on March 2, 2020, with Kozyrev attending via video conference. Esenova's counsel asked Kozyrev about his visa application. Notwithstanding his earlier submission that he unsuccessfully attempted to obtain a visa, Kozyrev responded he never applied for a visa to travel to the United States. *See* ECF No. [154] ¶ 33.[5]

### 2.    Testimony Regarding Documents Substantiating the Loan Agreement and Execution of the Same

On March 3, 2020, the second day of trial, Esenova's counsel questioned Ponomarenko about his communication with Kozyrev regarding the Loan Agreement and documentation of the same:

> Q. Okay. In this case, we requested from you all communications between Alexandr Kozyrev and Dmitry Ponomarenko regarding the contract signed on January 12th, 2015. . . .
>
> Q. Your response, through your lawyers, was: "All responsive documents that are under the control or possession of Defendant Ponomarenko are being produced." No communications were produced. I'm asking if any exist.

Mar. 3, 2020 Trial Tr., ECF No. [178] at 89:16–18, 89:22–25.  Ponomarenko responded:

---

[5] The transcript from the first day of trial was not transcribed.  Esenova's characterization of Kozyrev's testimony is not disputed.

Case No. 19-cv-60497-BLOOM/Valle

> A. Specifically, my attorney did not ask from me for any of the communications done through WhatsApp, emails, telegram, or other electronic means.

*Id.* at 90:1–3. Esenova's counsel asked Ponomarenko for documentation of the Loan Agreement

again, resulting in the following exchange:

> Q. Your attorney didn't ask you for communications relating to the agreement or relating to anything?
>
> A. Of course I responded that we were communicating with Alexandr regarding different issues regarding the transfer of the house. We have been in contact regarding different issues.
>
> Q. You didn't provide us with any documents relating to communications between the two of you, correct?
>
> A. **Nobody asked me for that**.
>
> Q. We also requested all documents between you and Alexandr Kozyrev relating to or reflecting communications to the effect that you were not performing. Were you ever asked for those communications?
>
> A. Probably, yes. It was a long time ago.
>
> Q. Probably yes what?
>
> A. Yes.
>
> Q. Yes, there was written communications?
>
> A. Yes, there were written communications.
>
> Q. Okay. But you didn't produce them in this case, correct?
>
> A. Oral as well. **Nobody asked me to produce them**.
>
> Q. Okay. Well, you understand that Ms. Esenova's attorneys asked you for them, don't you, sir?
>
> A. **I don't know about it**.
>
> Q. "Letters and faxes received by Defendant," received by you, "requesting payment of the amounts alleged to be owed to Kozyrev."
>
> A. I don't have faxes.

Q. How about letters?

A. No. I didn't receive them.

*See id.* at 90:4–91:7 (emphasis added).

Esenova's counsel also questioned Ponomarenko about the execution of the Loan Agreement:

Q. Let's talk about this January 2015 agreement. Where was it signed?

A. In Moscow.

Q. Where?

A. In the -- in an office or at a restaurant. I don't remember exactly.

Q. Who prepared it?

A. Counselors did.

Q. I'm sorry?

A. Counsels. Jurists did.

*Id.* at 76:11–20.

On the last day of trial, however, Ponomarenko testified the Loan Agreement was prepared in Moscow, but signed in Thailand:

A. So we clarified this situation. On January 12th, the loan -- the agreement was prepared by the attorneys, while on January 20th I arrived to Thailand, which is confirmed by the stamps in my passport. So most probably, we sign it -- on the 20th or 22nd, we signed the agreement.

Mar. 5, 2020 Trial Tr., ECF No. [179] at 4:4–9. Esenova's counsel cross examined Ponomarenko, asking him again about documentation of the Loan Agreement, resulting in the following exchange:

Q. I'm referring to the — excuse me, sir. I'm referring to the document that this lawsuit is about, the one that was signed in Moscow or Thailand on probably January 20th. It's dated January 12th.

A. That document had been discussed for six month[s]. [Esenova] knew about it. The document was prepared on January 12th and signed in Thailand later on. And the January 12th — because it's a first business day in Russia after the winter break.

. . .

Q. But once again, you have no emails that you have given to us, no communications that you have given to us showing six months of document preparation. Isn't that true, sir?

A. Had someone asked me for that, I would have probably provided.

Q. Well, we talked about this the other day. We asked you for it, sir. Your ex-wife asked you for it in this litigation and you didn't produce a shred of paper, sir.

A. Nobody asked me about that.

*Id.* at 17:17–24; 18:13–21. Esenova's counsel then questioned Ponomarenko about his passport:

Q. Sir, you got to Moscow on January 18th, correct?

A. Yes.

Q. And then do you know when you went to Thailand, sir?

A. Yes.

Q. When?

A. On the 20th.

Q. 20th of January?

A. Yes.

Q. I'm just going to need your assistance, because I couldn't find that in your passport. So if you could show me, I would appreciate it.

(Pause in proceedings.)

THE WITNESS: You cannot see clearly all the numbers on the stamps here. Maybe it was — the stamp was in the second Russian passport. So there is a stamp showing

that I arrived by plane on the 18th to Moscow. Some stamps are washed out. So I don't see the stamp showing the arrival in Thailand. Maybe it's in the second passport.

*Id.* at 20:22–21:14. Ponomarenko did not produce the second passport, stating no one had asked him for the same. *See id.* at 22:16–18.

### 3.    Testimony Regarding Ownership of the Property

On the first day of trial, Kozyrev's counsel submitted a Quitclaim Deed dated June 4, 2017 ("2017 Quitclaim"), *see* ECF No. [132-1], as a trial exhibit.  The 2017 Quitclaim shows the transfer of the Property from Kozyrev to a company, Gloria Capital Miami 2016 LLC ("Gloria Capital"), however, both Kozyrev and Ponomarenko disputed the legal validity of the transfer. *See* Motion for Judgment, ECF No. [132]. Kozyrev also testified he was unaware of the subsequent transfer of the Property from Gloria Capital to Ponomarenko and Esenova, pursuant to the Marital Settlement Agreement, until after the fact:

> Q. When did you learn that that house was deeded to Mr. Ponomarenko and Ms. Esenova?
>
> A. I learned -- it was when Mr. Ponomarenko admitted to me honestly that in the process of the divorce procedures the Judge ordered the house to be split between him and Ms. Esenova. And he admitted it honestly to me. And of course I was upset by this news.
>
> Q. Did they ask for your approval for this transaction of transfer in the property to Mr. Ponomarenko and Ms. Esenova?
>
> A. No. I learned about it only after it was done.

Mar. 2, 2020 Trial Tr., ECF No. [132-2] at 11:5–14.[6]

On the second day of trial, Esenova's counsel questioned Ponomarenko about the ownership of the Property.  Ponomarenko testified he purchased property in his name and moved

---

[6] Citations to deposition transcript testimony rely on the pagination and line numbering in the original document.

into it in 2013. *See* ECF No. [178] at 78:23–79:2. According to Ponomarenko, approximately three years later, he transferred the Property to Gloria Capital. *See id.* 80:13–19. At the conclusion of his testimony, in response to a jury question, Ponomarenko testified he formed Gloria Capital under his name and later transferred the company into Kozyrev's name. *See id.* at 95:13–17.

Kozyrev's counsel also questioned Ponomarenko about the ownership of the Property. Ponomarenko testified he "approved the [Property] to be deeded to Mr. Kozyrev . . . because the house was acquired with Mr. Kozyrev's money and it happened back about 2016." ECF No. [178] at 18:3–6. Ponomarenko further testified "if I understand it correctly, eventually Alexandr re-registered this house in the name of a company that was set up to develop his business, but I have doubts about the correctness of such a transfer. But it's not up to me to judge." *Id.* at 18:6–10.

During the same examination by Kozyrev's counsel, Ponomarenko stated he "transferr[ed] the *part* of the house to Kozyrev to settle [his] debt." *Id.* at 20:24–25 (emphasis added). Later, in response to a jury question, Ponomarenko stated, "[t]he amount $4.7 million constitutes the total amount of debt owed by my family to Mr. Kozyrev. I turned over *half* of my -- my half of the property to Mr. Kozyrev, so this amount can be subtracted from that total amount and I will continue." *Id.* at 96:20–24 (emphasis added).

When questioned by his own counsel about the transfer of the Property from Gloria Capital to Ponomarenko and Esenova, Ponomarenko testified as follows:

> Q. In 2018, Gloria Capital Miami 2016 transfer[ed] a house to Mr. Ponomarenko and Fatima Esenova. For that time, did you think that this house belong[ed] to Gloria Capital Miami or to Mr. Kozyrev?
>
> A. **I believed that the house belonged to Mr. Kozyrev. But I thought that I could make decisions and control this house**.
>
> Q. Why did you make this transaction?

> A. I executed this transaction because a settlement agreement was signed and approved by the Court.

*Id.* at 26:25–27:8.

Finally, Esenova's counsel questioned Ponomarenko about his transfer of a portion of the Property *back* to Kozyrev. Ponomarenko conceded he transferred a portion of the Property to Kozyrev notwithstanding the Marital Settlement Agreement's provision barring the transfer the Property without both Ponomarenko and Esenova's agreement. *See id.* at 47:11–14. Later within the same examination, Ponomarenko testified the house "belonged 50 percent to me." *Id.* at 50:13.

### F. Motion for Directed Verdict and Supplemental Stipulated Agreement

At the conclusion of the second day of Trial, the Court asked the parties whether they would stipulate to any claims. *See* Mar. 3, 2020 Trial Tr., ECF No. [180] at 12:25–13:7. Ponomarenko's counsel stated Ponomarenko would admit there was a contract between him and Kozyrev, and that he breached the same. *See id.* at 13:12–17. He further stated Ponomarenko's position was Ponomarenko "hasn't any dispute for the situation" but that he "simply hasn't the possibility to repay the payment" and accordingly, "[t]hat is why it's his position that his ex-wife has also [an] obligation. And he will admit the amount which will be announced and requested by the Plaintiff." *Id.* at 14:7–11.

The Court questioned Kozyrev's counsel whether he would proceed with a breach of contract claim against Esenova. *See id.* at 15:24–16:1. When counsel answered yes, the Court asked about the basis for the breach of contract claim against Esenova given she had not signed the loan agreement. *See id.* at 16:4–6. Kozyrev's counsel stated they would proceed on the theory Esenova was a third-party beneficiary. *Id.* at 16:17–18. The Court noted the Complaint did not plead third-party beneficiary liability. *See id.* at 16:19–18. Kozyrev's counsel asserted the theory was implied. *See id.* at 17:3.

The same day, Kozyrev filed the Motion for Judgment, ECF No. [132], on "the issue . . . [of] the invalidity or voidness [sic] of the conveyance on June 4, 2017, of the title to the [P]roperty[.]" *Id.* at 1. In the Motion, Kozyrev claimed he and Ponomarenko agreed the Property had belonged to Kozyrev since April 29, 2016, and "Esenova has no lawful stake in the [Property]." *Id.* The Motion further states "**Defendant Ponomarenko concedes that the 100% title to the above realty . . . has remained since April 29, 2016 unchanged and has remained vested in Plaintiff Kozyrev**." *Id.* at 7 (emphasis added). Kozyrev and Ponomarenko also agreed the 2017 Quitclaim, introduced on the first day of trial, was legally invalid. *See id.* at 7.

The Motion did not discuss Ponomarenko's earlier testimony that he owned only half of the Property.  Neither did the Motion discuss the Martial Settlement Agreement, Kozyrev's statement that Esenova owned half of the Property in the Motion for Confession, or the 2020 Quitclaim deed showing the transfer of the Property from Ponomarenko to Kozyrev in 2020.

On March 5, 2020, the final day of trial, Kozyrev and Ponomarenko filed a joint "Supplemental Stipulated Agreement . . . Concerning Admission of Certain Claims at Jury Trial," ECF No. [136].  Under the Stipulation, Kozyrev and Ponomarenko agreed Ponomarenko admitted (1) "the existence of the Loan Agreement dated January 12, 2015, which is deemed a valid and enforceable contract," (2) Ponomarenko  "has been in breach of the said Loan Agreement dated January 12, 2015," and (3) "the damages for breach of the said Loan Agreement to the extent of 50% of funds, actually received from July of 2015 to January 2018, namely half of the received amounts totaling in $4,695,601 and 5 cents." *Id.* ¶¶ 12–14.

## G.    Jury Verdict

The jury was asked whether they found that a valid contract existed between Kozyrev and Ponomarenko, considering Ponomarenko admitted to entering into the Loan Agreement and

breaching it.  The jury found there was no valid contract.  *See* Verdict Form, ECF No. [140] at 1.

The jury also found that Kozyrev did not provide a benefit to Ponomarenko or Esenova.  *See id.* at

2–3.

### H.     Conclusion of Marital Dispute

On July 29, 2020, The Fourth District Court of Appeal of the State of Florida rejected the

Ponomarenko's appeal in the Divorce Action, denying "relief from judgment, as the notice of

appeal was . . . untimely" and affirming the order denying Ponomarenko's petition for

modification." *See* ECF No. [184]. The court also denied Esenova's motion for attorney's fees.

*See* ECF No. [185-1].

*          *          *

The motions presently before the Court raise a host of issues concerning the conduct of

the parties throughout this dispute.  These are summarized as follows:

1.   *Sanctions Motion*.  Esenova claims Kozyrev and Ponomarenko acted in bad faith.

She argues they should be sanctioned pursuant to the Court's inherent powers and pursuant to 28

U.S.C. § 1927.[7]

2.   *Discovery Motion*.   Kozyrev, with Ponomarenko's support, claims one of

Esenova's attorneys — Leonid Budyonny — engaged in the unauthorized practice of law, and

argues he is entitled to discovery regarding the same in order to "properly address the Motion for

attorney's fees." ECF No. [158] at 4.

3.   *Judicial Notice Motion*. Kozyrev, with Ponomarenko's support, request the Court

take judicial notice of (1) Budyonny's registration as in house counsel for World Fuel Services,

Corp. in Miami Florida and; (2) Chapter 17 of the Rules Regulating the Florida Bar, arguing these

---

[7] Esenova moves pursuant to "**18** U.S.C. [section] 1927." ECF No. [154] at 9 (emphasis added).  This appears to be a scrivener's error.

materials tend to show the invoices submitted in support of the Sanctions Motion are "illegal and unenforceable." ECF No. [157] at 2.

4. *Costs Motion.* Esenova argues as the prevailing party she is entitled to costs, other than attorney's fees, under Rule 54(d)(1) and 28 U.S.C. § 1920. *See generally* ECF No. ECF No. [153].

## II.    LEGAL STANDARDS

### A.    Sanctions

Courts have the "inherent power to police those appearing before them." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)).  This power, "not conferred by rule or statute," allows courts to "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (citation and internal quotation marks omitted).  A court may exercise its power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Purchasing Power, LLC*, 851 F.3d at 1223 (citation and internal quotation marks omitted). "In determining whether sanctions should be awarded under the bad faith standard, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.'" *Barash v. Kates*, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006) (quoting *Rothenberg v. Sec. Mgmt. Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir. 1984)).

The inherent power to impose sanctions "must be exercised with restraint and discretion" and used "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45 (citation omitted).  To that end, a sanction may serve to compensate a party wronged, but should not be leveled as a penalty.  *See Goodyear*, 137 S. Ct. at 1186.  "[A]

sanction counts as compensatory only if it is calibrated to the damages caused by the bad-faith acts on which it is based." *Id.* (alterations adopted; internal quotation marks and citation omitted).

Under 28 U.S.C. § 1927, the court my sanction "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously" to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Id.* "[T]he provisions of [section] 1927, being penal in nature, must be strictly construed." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1395 (11th Cir. 1997) (citation and internal quotation marks omitted). "The statute's plain language sets forth three requirements to justify an imposition of sanctions: (1) an attorney must engage in 'unreasonable and vexatious' conduct; (2) such 'unreasonable and vexatious' conduct must 'multiply the proceedings;' and (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct." *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1281 (11th Cir. 2010) (alterations adopted; citations omitted).

Under Rule 54(d)(2)(c), a court "may decide issues of liability for fees before receiving submissions on the value of services." *Id.*; *see also* S.D. Fla. L.R. 7.3(a) ("Pursuant to Federal Rule of Civil Procedure 54(d)(2)(C), either party may move the Court to determine entitlement prior to submission on the issue of amount.").

**B.    Costs**

Pursuant to Rule 54(d) "[u]nless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party." Costs may include: (1) fees of the clerk and marshal; (2) fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) docket fees; and (6) compensation of court

appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services. *See* 28 U.S.C. § 1920. A motion for costs should be accompanied by a bill of costs. *See id.*

### C.   Post-Judgment Discovery and the Unauthorized Practice of Law

The Federal Rules allow for discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Because Kozyrev seeks discovery in connection with his allegation that Esenova's counsel engaged in the unauthorized practice of law, the Court briefly reviews the legal standards and rules of professional conduct relating to the same.

"No private right of action exists for individuals to pursue an unauthorized-practice-of-law claim in the first instance[.]" *Gonczi v. Countrywide Home Loans, Inc.*, 271 F. App'x 928, 930 (11th Cir. 2008) (citation omitted). Rather, "the Florida Supreme Court has delegated its authority over the investigation and prohibition of the unlicensed practice to the Florida Bar." *Id.* at 929–30. Analysis of the unauthorized practice of law considers whether the activity at issue constitutes the practice of law in the first instance, and if so, whether the activity was unauthorized. *See The Fla. Bar v. Moses*, 380 So. 2d 412, 416 (Fla. 1980) ("Having concluded that respondent's conduct constitutes the practice of law, the next question is . . . whether respondent's conduct was authorized representation before an agency or the unauthorized practice of law subject to this Court's control.").

Rule 4-5.5 of the Rules Regulating the Florida Bar governs the unauthorized practice of law. Under Rule 4-5.5(c) "[a] lawyer admitted and authorized to practice law in another United States jurisdiction . . . , may provide legal services on a temporary basis in Florida that are . . .

undertaken in association with a lawyer who is admitted to practice in Florida and who actively participates in the matter[.]" *Id.*

### D.     Judicial Notice

Federal Rule of Evidence 201(b)(2) permits the Court to take judicial notice of a fact which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).   "The court may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(d).   "A court's decision to take judicial notice of a fact is nothing more than a finding that the proffering party need not undertake the burden of litigating the existence of the fact." *United States v. Falcon*, 957 F. Supp. 1572, 1585 (S.D. Fla. 1997), *aff'd*, 168 F.3d 505 (11th Cir. 1999). "[A] court may refuse to take judicial notice of facts that are irrelevant to the proceeding or (in certain contexts) otherwise excludable under the Federal Rules." *Id.* (collecting cases).

## III.     DISCUSSION

The Court begins with the most contentious dispute: whether Esenova is entitled to sanctions in the form of attorney's fees based on Kozyrev and Ponomarenko's alleged bad-faith conduct during this case.   The Court finds she is entitled to partial fees.

### A.     The Sanctions Motion

#### 1.     The Parties' Arguments

Esenova argues she is entitled to attorney's fees because Kozyrev and Ponomarenko acted in collusion to bring a baseless lawsuit against her to deprive her of assets — proceeds from the sale of the Property — to which she was entitled based on the Martial Settlement Agreement. *See generally* ECF No. [154]. In support of this broad contention, Esenova points to ten specific instances, or categories of conduct, tending to show bad faith: (1) Kozyrev's misrepresentations

regarding his visa application, *see id.* at 11–12; (2) the allegedly fraudulent *lis pendens*, *see id.* at 12–13; (3) Kozyrev and Ponomarenko's misrepresentations regarding the Loan Agreement, *see id.* at 13; (4) the baseless breach of contract claim against Esenova, *see id.* at 13–14; (5) the baseless unjust enrichment claim against Esenova, *see id.* at 14–15; (6) misrepresentations regarding the execution of the alleged Loan Agreement, *see id.* at 15; (7) misrepresentations concerning the wire transfers in connection with the Loan Agreement, *see id.* at 15–17; (8) Kozyrev and Ponomarenko's failure to produce documents relevant to the Loan Agreement despite representations they would do so, *see id.* at 17–18; (9) Kozyrev's misrepresentations regarding the ownership of the Property, *see id.* at 18; and (10) Kozyrev and Ponomarenko's demeaning conduct toward Esenova during trial, *see id.*

Kozyrev responds to the Sanctions Motion with the following points: (1) he is in fact the owner of the Property,[8] *see* ECF No. [156] at 2–4; (2) one of Esenova's attorneys, Budyonny, engaged in the unauthorized practice of law, *see id.* at 4–9; (3) Nine of Esenova's substantive motions were denied; (4) Esenova's attorney, Joseph Altschul, failed to properly serve the Sanctions Motion under Local Rule 7.3(b), *see id.* at 9–11; (5) Esenova's claim for fees was previously denied by the Court, *see id.* at 11–14; (6) Esenova forfeited claims of bad-faith in connection with discovery because she failed to file motions to compel, *see id.* at 14; (7) Esenova's attack on the Loan Agreement was based on hearsay, *see id.* at 14–15; (8) Kozyrev should be excused from preparing to litigate in the United States because of medical conditions, *see id.* at 15–16; (9) Esenova rejected attempts to settle the action, *see id.* at 16–18; and (10) Esenova was denied attorney's fees in the related Divorce Action, *see id.* at 18–19.

---

[8] Kozyrev submits a translated Affidavit declaring the same.  *See* ECF No. [156-1].

Ponomarenko's Opposition elaborates on several of the issues highlighted by Kozyrev.  *See generally* ECF No. [160].  Like Kozyrev, he argues Esenova's counsel, Budyonny, engaged in the unauthorized practice of law and, with regard to discovery issues, Esenova failed to file motions to compel. *See* Ponomarenko Opp., ECF No. [160] at 1–10, 18.  Ponomarenko further alleges Budyonny engaged in unethical behavior during litigation and Esenova's other attorney, Altschul, sponsored Budyonny's unauthorized activities.  *See id.* at 1–13.  Ponomarenko insists his attorney, Gary Grant, should not be subject to sanctions as Grant was not the individual who filed the Complaint in the first instance. *See id.* at 13–14. Ponomarenko insists the Court should not find Esenova is entitled to any fees claimed on behalf of the work completed by her former attorneys Ama-Mariya Hoffenden and Bruce Prober, for several reasons, including that several motions brought by the attorneys were denied; Hoffenden relied on another attorney's work; Hoffenden co-mingled the fees charged in this case and a related state court action; and Hoffenden was late to several depositions.  *See id.* at 14–18. Finally, Ponomarenko argues that Esenova's claims he acted in bad faith are without merit and based on hearsay. *See id.* at 19–20.

## 2.     Whether Kozyrev and Ponomarenko Engaged in Bad Faith

Esenova moves for sanctions in the form of attorney's fees pursuant to 28 U.S.C. § 1927 and the Court's inherent power. "The key to unlocking a court's inherent power is a finding of bad faith." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (alteration adopted; citation omitted).  Because the Court finds Kozrev and Ponomarenko acted in bad faith in three specific instances, it imposes sanctions on them pursuant to its inherent power.

> Bad faith can be found in several instances. First, bad faith may be found where the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled. Second, bad faith may be found where a party delays or disrupts the litigation, or hampers the enforcement of a court order.  Third, the Eleventh Circuit has stated that bad faith may be found where an attorney knowingly or

recklessly raises a frivolous argument, or argues a meritorious claim for the purpose
of harassing an opponent.

*Barash*, 585 F. Supp. 2d at 1362 (alterations adopted; internal quotation marks and citations
omitted). The Court is mindful the power to impose sanctions must be "exercised with restraint
and discretion," *Chambers*, 501 U.S. at 44 (citation omitted), and courts outside the Eleventh
Circuit "have required that when imposing attorney's fees as sanctions pursuant to their inherent
authority, the conduct be proven by clear and convincing evidence," *Barash*, 585 F. Supp. at 1365.
Accordingly, the Court confines it's analysis to whether there is record evidence Kozyrev or
Ponomarenko made affirmative misrepresentations to the Court or initiated or pursued claims
known to be baseless.

Taken together, the following three events demonstrate bad faith: (1) Kozyrev and
Ponomarenko's false and inconsistent claims regarding ownership of the Property; (2)
Ponomarenko's testimony he was unaware of discovery requests seeking information
substantiating the Loan Agreement notwithstanding his response to Esenova's discovery requests;
and (3) Ponomarenko's conflicting testimony regarding the signing of the Loan Agreement.

### i. Inconsistent representations Regarding Ownership of the Property.

A summary of Ponomarenko and Kozyrev's claims to the Property is as follows:

**First**, Kozyrev filed this lawsuit alleging Ponomarenko and Esenova owed him
approximately $4.6 million pursuant to the Loan Agreement, and sought relief including the
recording of a lis pendens on Co-Defendants' property in Florida. *See* ECF No. [1].

**Second**, Kozyrev used the caption of this lawsuit as the basis to file a Notice of Lis Pendens
on the Property. *See* ECF No. [58] at 11.

**Third**, Kozyrev filed the Motion for Confession stating: (1) Kozyrev and Ponomarenko
engaged in discussions to settle the claims; (2) Ponomarenko admitted to receiving money from

Kozyrev between 2015 and 2018 which he had not repaid; (3) *as part of the compromise*, Ponomarenko "ha[d] conveyed to Kozyrev" any rights that he has in the [Property]; and (4) "[b]y way of reporting to the Court on the status of the ownership of the above [P]roperty, defendant Esenova owns the other 50% interest in the title to that [P]roperty[.]" ECF No. [64].

**Fourth**, after Esenova filed the Marital Settlement Agreement, ECF No. [67] at 5–12, Ponomarenko filed a Response, ECF No. [69], (1) attaching the 2020 Quitclaim, ECF No. [69-1], showing the transfer of the Property from Ponomarenko to Kozyrev; and (2) explaining "Kozyrev . . . is presently the owner of the 50% state in the [Property]."  Kozyrev filed the same 2020 Quitclaim. *See* ECF No. [70-2].  Both Kozyrev and Ponomarenko stated Esenova consented to Ponomarenko transferring his interest in the property to Kozyrev. *See* ECF Nos. [64] and [70].

**Fifth**, Ponomarenko testified he created a company — Gloria Capital, and — "about 2016" "approved the [Property] to be deeded to Mr. Kozyrev . . . because the house was acquired with Mr. Kozyrev's money and it happened back about 2016."  ECF No. [178] at 18:3–6.

**Sixth**, at trial, Kozyrev introduced the 2017 Quitclaim, showing the transfer of the property from Kozyrev to Gloria Capital, but simultaneously argued the transfer was legally invalid. *See* ECF No. [132].

**Seventh**, Ponomarenko testified he transferred the Property from Gloria Capital to himself and Esenova despite "believ[ing] the house belonged to Mr. Kozyrev." *See* ECF No. [178] at 26:25–27:8.

**Seventh**, Kozyrev filed the Motion for Judgment stating he owned, and had owed, 100% of the Property since April 29, 2016.  *See* ECF No. [132] at 7, ¶ 10. The Motion for Judgment attached the 2017 Quitclaim he alleged to be legally invalid.

Not all these ownership-scenarios can be true.  The most obvious inconsistency is seen comparing Kozyrev and Ponomarenko's initial statement that Esenova owned 50% of the Property in 2020, *see* Motion for Confession ECF No. [64], with Kozyrev and Ponomarenko's later statement that Kozyrev owned (and continues to own) 100% of the Property since 2016, *see* Motion for Judgment, ECF No. [132].  If the later representation is true, the Court finds no basis for Kozyrev and Ponomarenko's submission of the 2020 Quitclaim, ECF Nos. [69-1] & [70-2], showing the transfer of the Property from Ponomarenko *back* to Kozyrev.  More fundamentally, the Court is unclear why Kozyrev, who now claims he owns the Property outright, used this lawsuit as a basis to file a lis pendens on the very same Property. Although the Court initially found it was "far from clear that [Esenova] [was] entitled to discharge of the lis pendens," ECF No. [63] at 3, this finding was made on the basis of Kozyrev's allegations he was entitled to the Property as security for the Loan Amounts, not that Kozyrev — as he now alleges — owned the Property outright since 2016. In the same vein, the Court cannot reasonably credit Ponomarenko's statement he believed Kozyrev owned the Property, but Ponomarenko was nonetheless entitled to transfer the Property from Gloria Capital to himself pursuant to the Marital Settlement Agreement. See ECF No. [178] at 26:25–27:8.

In sum, there is no good faith basis for Ponomarenko to have been unclear as to his rights to the Property in the first instance. Certainly, Kozyrev knew or should have known who owned the Property after the disclosure of the Marital Settlement Agreement.  Nonetheless, both Kozyrev and Ponomarenko made numerous, conflicting representations to the Court about the ownership of the Property. These inconsistent statements weigh in favor of a finding of bad faith.

### ii.  Documentation of the Loan Agreement

During litigation but prior to the filing of the Marital Settlement Agreement, the parties engaged in discovery.  As noted, Esenova requested communications regarding the Loan Agreement and financial information showing the transfer of the loan amounts from Kozyrev to Ponomarenko.  *See* ECF No. [154].  Both Kozyrev and Ponomarenko responded to these requests, stating "all responsive documents . . . are being produced."  *See* ECF No. [154] at 30–38; 40–45. Notwithstanding these responses, no communications concerning the Loan Agreement were produced.

At trial, Esenova's counsel asked Ponomarenko whether he possessed communications about the Loan Agreement. *See* ECF No. [178] at 89:16–18, 22–25. Ponomarenko conceded he possessed the documents, but, notwithstanding his response to Esenova's request for production, *see* ECF No. [154], stated "[n]obody asked me to produce them." ECF No. [178] at 90:23. When reminded that Esenova's attorneys asked him for the documents, Kozyrev responded "I don't know about it." *Id.* at 91:1. In light of Esenova's request for production, and Kozyrev's response to the same, the Court finds Kozyrev's testimony untrue.

### iii.  Testimony Regarding Execution of the Loan Agreement

Finally, Ponomarenko conceded his initial testimony about the execution of the Loan Agreement was false.  On March 3, 2020, he testified he signed the Loan Agreement in Moscow. *See* ECF No. [178] at 76:11–20.  Two days later, to respond to testimony that he was not in Moscow on January 12, 2015, Ponomarenko testified the Loan Agreement was signed in Thailand. *See* ECF No. [179] at 4:4–9. Yet, when asked to substantiate his location with his passport, Ponomarenko was unable to do so with the passport he brought to Court. *Id.* at 20:22–21:14.

*       *       *

Ponomarenko's inconsistent testimony regarding the signing of the Loan Agreement and communications regarding the same strain credulity. Certainly, the refusal to produce any communications regarding the signing of a $4.6 million Loan Agreement, notwithstanding assurances the documents existed and would be produced, caused undue delay and confusion in an effort to litigate claims about the very same Loan Agreement. The fact Kozyrev used this lawsuit to claim entitlement to the Property, engaged in months' long-litigation, only to undercut his own claims during trial by alleging he owned the Property all along, demonstrates Kozyrev and Ponomarenko's initial representations about the Property ownership were frivolous, and in bad faith.

The Court does not rest its finding on any one of the foregoing events alone.  As noted by the Eleventh Circuit

> false statements alone do not indicate bad faith. Without a "smoking gun" statement from the plaintiff, i.e., "I know my claim is frivolous and I am pursuing this claim to harass the defendants," a district court makes a determination of bad faith by drawing inferences from the conduct before it. Standing alone, a false or inconsistent statement in a deposition does not compel the conclusion of bad faith. A false statement can be evidence of bad faith if, for instance, there is other evidence in the record indicating that the statement was made for a harassing or frivolous purpose.

*Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir. 2001).  The "other evidence" is Kozyrev and Ponomarenko's continued misrepresentations concerning ownership of the Property following the filing of the Martial Settlement Agreement, and the lack of any documentary evidence substantiating the Loan Agreement notwithstanding the parties' assurance such documents would be produced.

In this respect, the Court is guided by *Barash*, an inheritance case, where the court imposed sanctions against one of the plaintiffs because he admitted to committing perjury in another action and proffered several "different versions" of the facts underlying the case. *See* 585 F. Supp. 2d at

1358.  In *Barash*, the plaintiff — the son-in-law of the deceased and executor of her estate —
testified to different versions of facts surrounding the drafting and signing of a letter in which the
decedent resigned from her position of Trustee of her trust and transferred assets to one of her
daughters.   *See id.* at 1366–67. The son-in-law first testified he had no involvement in the
preparation of the letter, *see id.* at 1350, but was later directed to record evidence in another case
showing he prepared the letter himself, *see id.* at 1351. The plaintiff also testified he was
"surprised" to receive the letter, *see id.* at 1351, but was later directed to deposition testimony
where he stated he spoke with the decedent about the letter several days after it was drafted.  *See
id.* at 1352.  Considering the plaintiff's inconsistent statements, propensity for perjury, and his
"open display of animosity and imperious behavior at trial, the Court concluded that the plaintiff
"used the instant action to harass [the defendant] and her family." *Id.* at 1367; *See also Aguilar v.
United Floor Crew, Inc.*, No. 14-CIV-61605, 2015 WL 2415421, at *14 (S.D. Fla. May 21, 2015)
(finding the plaintiff's inconsistent statements during testimony contributed to a finding of bad-
faith.).

Here, Kozyrev submitted a Loan Agreement to the Court stating (1) Kozyrev was entitled
to Ponomarenko's "joint marital property" and, (2) "there will be no protection against the
acquisition of assets during the marriage," for the "borrower's spouse," notwithstanding the fact
Esenova did not sign the Loan Agreement. ECF No. [1-2] ¶ 11. Thereafter, Kozyrev quickly filed
a Motion for Judgment, where Ponomarenko *admitted* to breaching the Loan Agreement and, in
order to settle the dispute, transferred half of the Property to Kozyrev. *See* ECF No. [64].  The
resulting Stipulated Judgment, ECF No. [66], against Ponomarenko left Esenova as the sole
Defendant. After the Marital Settlement Agreement was then disclosed for the first time by
Esenova, the Court vacated the Stipulated Judgment and the case proceeded to trial. It was there

that Ponomarenko and Kozyrev changed their positions, asserting Kozyrev owned the Property outright and Ponomarenko had no authority to transfer it in the first instance. *See* ECF No. [132]. This was quickly followed by the Supplemental Stipulated Agreement, ECF, No. [166], where Ponomarenko again admitted to breaching the Loan Agreement, but this time conceded he owed damages totaling *half* of the Loan Amount, instead of stating — as he had before — he conveyed half of the Property to Kozyrev.  None of these claims were based on any evidence aside from Kozyrev and Ponomarenko's self-serving statements and documents created and signed by them. The Court finds no good faith basis for the contradiction in claims made by Kozyrev and Ponomarenko about the Property's ownership in the midst of trial after months-long litigation.  At most, Kozyrev and Ponomarenko's claims to the Court were fraudulent. At the very least, Kozyrev and Ponomarenko's claims were inconsistent misrepresentations to the Court, which vexatiously multiplied and confused this litigation. Thus, a finding of bad faith is warranted.

### 3.      Kozyrev and Ponomarenko's Oppositions

Importantly, neither Kozyrev nor Ponomarenko dispute their misrepresentations regarding ownership of the Property.  Indeed, they cannot, because the inconsistent statements are on the record and speak for themselves.  Instead, they present numerous arguments regarding *Esenova's* conduct throughout trial, and her attorney's alleged unauthorized practice of law.  The Court addresses the unauthorized practice of law issue in the next section, and briefly addresses Kozyrev and Ponomarenko's other arguments here.

Taken together, absent the unauthorized-practice-of-law allegations, the Oppositions argue (1) Kozyrev is in fact the owner of the Property, *see* ECF No. [156] at 2–4;  (2) Nine of Esenova's substantive motions were denied, *see id.* at 5; (3) Esenova's attorney, Joseph Altschul, failed to properly serve the Sanctions Motion under Local Rule 7.3(b), *see id.* at 9–11; (4) Esenova's claim

for fees was previously denied by the Court, *see id.* at 11–14; (5) Esenova forfeited claims of bad faith in connection with discovery because she failed to file motions to compel, *see id.* at 14; (6) Esenova's attack on the Loan Agreement was based on hearsay, *see id.* at 14–15; (7) Kozyrev should be excused from preparing to litigate in the United States because of medical conditions, *see id.* at 15–16; (8) Esenova rejected attempts to settle the action, *see id.* at 16–18; (9) Esenova was denied attorney's fees in the related Divorce Action, *see id.* at 18–19; (10) Ponomarenko's attorney, Gary Grant, should not be subject to sanctions as Grant was not the individual who filed the Complaint in the first instance, *see* ECF No. [160] at 13–14; (11) Esenova should not be entitled to any fees claimed on behalf of the work completed by her former attorneys Ama-Mariya Hoffenden and Bruce Prober, *see id.* at 14–18; and (12) Esenova's arguments Ponomarenko acted in bad faith are without merit and based on hearsay, *see id.* at 19–20.

None of these arguments provide the Court with any justification for Ponomarenko and Kozyrev's bad-faith conduct. Indeed, reason one — Kozyrev's assertion that he is in fact the owner of the Property — *support* the Court's finding of bad-faith. Otherwise, arguments four, six through nine, eleven and twelve simply have no bearing on the Court's finding of specific, on-the-record, evidence that Ponomarenko and Kozyrev made false or inconsistent statements.

With regard to argument two, Kozyrev fails to identify or discuss the motions that were denied. Moreover, the Court notes it denied Esenova's attempt to amend her affirmative defenses to include collusion on timeliness grounds, *see* ECF No. [77], and did not reject the factual contentions underlying her motion.[9]

---

[9] The Court denied Esenova's Motion to Reconsider, ECF No. [78], because she did not demonstrate (1) an intervening change in controlling law, (2) the availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice. *See* ECF No. [79] at 2.

With regard to argument three — that the Motion was not properly served under Rule 7.3(b) — the Court notes the parties conferred regarding the Sanctions Motion via email, *See* Reply, Ex. C, ECF No. [174] at 36–40.  Regarding argument five — that Esenova is not entitled to attorney's fees in connection with discovery because she failed to file motions to compel — the Court acknowledges authority requiring an "order compelling discovery, a willful violation of that order, and prejudice to the other party" before imposing sanctions under Rule 37. *Feingold v. Budner*, No. 08-80539-Civ, 2009 WL 10667624, at *3 (S.D. Fla. May 29, 2009) (quoting *Mems v. City of St. Paul, Dept. of Fire & Safety Srvcs.*, 327 F.3d 771, 779 (8th Cir. 2003)).  Here, however, the Court imposes sanctions because Ponomarenko falsely testified that he was unaware of Esenova's discovery requests, not because he failed to produce the requested documents.  In any event, the Court does not impose sanctions under Rule 37, but pursuant to its inherent power. Finally, regarding argument ten, as explained below, because the Court finds both Kozyrev and Ponomarenko acted in bad faith, it imposes sanctions on both parties.

### 4.    Amount of Sanctions

Esenova seeks sanctions in the amount $108,875.50, for work completed since April 11, 2019 (the date Esenova's initial counsel entered an appearance in this matter) to the present.  *See* ECF No. [154] at 20; Notice of Appearance, ECF No. [14]. Sanctions, however, must be "calibrated to the damages caused" by the bad faith conduct at issue. *Goodyear*, 137 S. Ct. at 1186 (alteration adopted); *see also Orenshteyn v. Citrix Sys., Inc.*, No. 02-60478-Civ, 2014 WL 11320634, at *6 (S.D. Fla. Sept. 11, 2014), *report and recommendation adopted*, No. 02-60478-Civ, 2014 WL 11320631 (S.D. Fla. Sept. 26, 2014), *aff'd*, 609 F. App'x 654 (Fed. Cir. 2015) ("The Court must pare down the hours of legal services that [the defendant] claims, to those reasonably incurred as a result of the sanctioned conduct."). This case presents a challenge, because the

Court's finding of bad faith is based on several instances throughout the course of litigation, up to and including trial, and it is difficult to make a precise determination as to when the damages began to flow. In like situations, courts have employed an "overall percentage reduction of the fees sought. *See Orenshteyn*, 2014 WL 11320634, at \*6 (recommending a one-third reduction in attorney's fees sought). Given much of the evidence of Kozyrev and Ponomarenko's bad faith occurred at trial, the Court finds that a portion, or 50%, of the attorney's fees billed by Altschul, Ms. Esenova's trial counsel, and his associate, Budyonny, represent a reasonable sanction. Based upon the documents presented, the Court finds that the respective rates charged by Altschul and Budyonny, given their experience and qualification, are reasonable. *See* ECF No. [154]. The Court awards $39,500.00, in sanctions.

### B.      Discovery Motion and Judicial Notice Motion

Kozyrev filed the Discovery Motion, ECF No. [158], and Judicial Notice Motion, ECF No. [157], in connection with his Opposition — specifically his argument that Esenova's attorney Leonid Budyonny engaged in the unauthorized practice of law.  Ponomarenko joined these motions.  *See* ECF Nos. [162] and [161].

The substance of Kozyrev and Ponomarenko's argument in their Oppositions to the Sanctions Motion is that Esenova is not entitled to attorney's fees because her own attorney, Budyonny, engaged in the unauthorized practice of law or other unethical conduct, and Altschul (Esenova's trial attorney) sponsored his conduct. *See* ECF Nos. [156] at 5–9; ECF No. [160] at 2–13. More specifically, Kozyrev argues (1) Budyonny practiced in Florida without being admitted to the Florida Bar, and (2) Budyonny worked for a Miami corporation, World Fuel Services, Corp., that did not authorize Budyonny to represent Esenova in this matter, *see* ECF No. [156] at 5–7. Accordingly, the Discovery Motion requests (1) a subpoena be issued to World Fuel Services

Corp. for communications concerning the "authorizations of its authorized house counsel Budyonny to represent Fatima Esenova"; (2) production of (a) Esenova's retainer agreements with all of her attorneys and (b) all written communications between Budyonny, on the one hand, and Esenova and Altschul, on the other hand, from February 20 to April 10, 2020, initially in a redacted form, with the Privilege Log. The Judicial Notice Motion requests the Court take notice of (1) the Florida Bar's registration of Budyonny as the authorized house counsel for World Fuel Services Corp; and (2) the Rules Regulating the Florida Bar chapter on Authorized House Counsel.

The Court finds no issue with taking judicial notice of the requested documents, *see* Fed R. Evid. 201(b)(2) (allowing the Court to take judicial notice of a fact which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"), but finds the issue to be a moot point because the unauthorized-practice-of law issue and related Discovery Motion lack merit.

First, the Court has no jurisdiction to determine whether Budyonny engaged in the unauthorized practice of law because the "Florida Supreme Court has delegated its authority over the investigation and prohibition of the unlicensed practice to the Florida Bar." *Gonczi*, 271 F. App'x at 929–30. Even if it did, neither Kozyrev nor Ponomarenko (1) have demonstrated they have standing to argue whether Budyonny's employer World Fuel Services Corp., permitted Budyonny to take clients outside of his practice as in-house counsel; or (2) reply to Esenova's argument under Rule 4-5.5(c) that an attorney not admitted to the practice of law in Florida "may provide legal services on a temporary basis in Florida that . . . are undertaken with a lawyer who is admitted to practice in Florida and who actively participates in the matter . . . ."

More fundamentally, like Ponomarenko and Kozyrev's other arguments in their Oppositions, the unauthorized-practice-of-law argument does nothing to justify the Court's finding

33

of bad faith on Ponomarenko and Kozyrev's part.[10] Neither Kozyrev nor Ponomarenko present the Court with authority stating the bad-faith conduct of one party may be balanced or canceled out by the unethical behavior of another. Furthermore, neither Kozyrev nor Ponomarenko move for attorney's fees in their own right or attempt to show Esenova's attorney's conduct meets the bad-faith standards described at length in this Order.

### C.    Costs Motion

Finally, the Court addresses the entitlement to costs. As the prevailing party, Esenova moves for costs against Kozyrev under Rule 54(d), 28 U.S.C. section 1920, and Local Rule 7.3(c). *See* ECF No. [153] at 1. The Motion to Tax Costs is accompanied by a Bill of Costs, ECF No. [153-1], identifying $229.97 in fees for "printed or electronically recorded transcripts necessarily obtained for use in this case," and $146.00 in fees for "exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." *Id.* at 1. In her Reply, ECF No. [163], in support of the Motion, Esenova withdraws the first claim for transcript costs, leaving only the $146.00 at issue. The $146.00 consists of $108.00 in fees from the Broward County Clerk of Court, *see* ECF No. [153-2] at 3, for copies of documents related to the Divorce Action, and $38.00 in fees from the Broward County Board of County Commissioners for copies of documents related to the Property, *see id.* at 4–5.

Kozyrev objects to the Motion, arguing it was untimely, notwithstanding the Court's Order granting Esenova's motion for an extension of time. *See* ECF No. [155] at 1–5. Kozyrev also claims it was not necessary for Esenova to obtain certified copies of the documents she used at trial because they were not contested or otherwise available online. *See id.* at 6–10.

---

[10] This is also true with respect to Kozyrev and Ponomarenko's claims that Esenova's initial attorneys engaged in unethical conduct.

Both of Kozyrev's arguments lack merit.  First, neither case cited by Kozyrev in support of his timeliness argument — *Allen-Johnson v. Miami-Dade Cty.*, No. 10-23627-Civ, 2012 WL 160070 (S.D. Fla. Jan. 18, 2012), and *Sullivan v. Cheshier*, 991 F. Supp. 999 (N.D. Ill. 1998) — stand for the premise a Bill of Costs is untimely when filed after the 30-day deadline with permission form the Court. To the contrary, "[t]he thirty day period in the Local Rule is not jurisdictional or the type of motion excluded from possible enlargement under the rule." *Skyywalker Records, Inc. v. Navarro*, 742 F. Supp. 638, 639 (S.D. Fla. 1990).[11] Second, evidence must be authenticated, and Esenova sought to do so by obtaining certified copies of her trial exhibits, as permitted under Federal Rule of Evidence 902.

Accordingly, Esenova is entitled to costs in the amount of $146.00.

## IV.   CONCLUSION

For the foregoing reasons it is, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Fatima Esenova's Motion for Attorney's Fees, **ECF No. [154]**, is **GRANTED in part**. Plaintiff Alexandr Kozyrev and Defendant Dmitry Ponomarenko, are sanctioned jointly and severally, in the amount of **$39,500.00**, representing approximately 50% of the fees billed by Esenova's counsel during trial.

2. Defendant Fatima Esenova's Motion to Tax Costs, **ECF No. [153]**, is **GRANTED** in part, and costs in the amount of **$146.00** are awarded in favor of Esenova and against Alexandr Kozyrev.

3. Plaintiff, Dmitry Kozyrev's Request . . . to Take Judicial Notice ("Judicial Notice Motion"), **ECF No. [157]**, is **GRANTED**.

---

[11] *Skyywalker Records, Inc.*, concerned Local Rule 10(f), the predecessor rule to Local Rule 7.3. *See* 742 F. Supp. at 639.

4.   Plaintiff, Dmitry Kozyrev's Cross-Motion . . . For Limited Discovery Concerning Unauthorized Practiced of Law ("Discovery Motion"), **ECF No. [158]**, is **DENIED**.

5.   Final Judgment will issue by separate order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 18, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

36